# MASTER SERVICES AGREEMENT

This Master Services Agreement (this "**Service Agreement**"), dated as of ___9/9/2023_____ (the "**Effective Date**"), is by and between SOS AbundaBox LLC, a Wyoming limited liability company ("**SOS**" or "**AbundaBox™**") and **Quickmed, LLC**, a Wyoming limited liability company ("**Client**" and together with AbundaBox, the "**Parties**", and each a "**Party**").

WHEREAS SOS Events is the owner of the Brand "AbundaBox™" and provides subscription services delivering medical and health related products to Medicare recipients;

WHEREAS AbundaBox™ has the capability and capacity to provide the consultative and billing services detailed on one or more Statements of Work, including the Initial Statement of Work attached as Exhibit A; and

WHEREAS Client desires to retain AbundaBox™ to provide the said services, and AbundaBox™ is willing to perform such services under the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, AbundaBox™ and Client agree as follows:

1.  Services.  AbundaBox™ shall provide to Client the services (the "**Services**") set out in one or more statements of work to be issued by Client and accepted by AbundaBox™ (each, a "**Statement of Work**," and together with the Service Agreement, the "**Agreement**").  The initial accepted Statement of Work is attached hereto as Exhibit A. Additional Statements of Work shall be deemed issued and accepted only if signed by the AbundaBox™ and Client.

2.  Client Obligations.  Client shall:

2.1.    Cooperate with AbundaBox™ in its performance of the consultation services and provide access to Client's premises, employees, EMR or EHR connectivity, contractors, and equipment as required to enable AbundaBox™ to provide the Services.

2.2.    Take all steps necessary, including obtaining any required licenses or consents, to prevent Client-caused delays in AbundaBox™'s provision of the Services. AbundaBox™, will endeavor to advise and further the Client's goal of providing best in class compliance. It is in both Parties best interest to continuously evolve and enhance protocols and ensure the highest regulatory adherence.
Client will provide all data required to perform the Services, including electronic and non-electronic information ("**Client Data**") to facilitate contact with certain customers of Client who receive Medicare, Medicaid, CHIPS, and other approved Benefits ("**Recipients**").  Client warrants and represents that such Client Data is complete and accurate and includes any relevant mail into the system. Client further represents and warrants that all such Client Data will be provided in a timely manner sufficient to allow AbundaBox™ to provide the Services set forth in the Agreement.  AbundaBox™ will rely on these representations in providing the Services and shall have no liability whatsoever arising from Client providing incomplete or inaccurate data or providing data in an untimely manner.

3.  Fees and Expenses.

3.1.    In consideration of the provision of the Services and Products provided by the AbundaBox™ and the rights granted to Client under this Agreement, Client shall pay the fees ("**Fees**") set

out in the applicable Statement of Work. Unless otherwise provided in the applicable Statement of Work, said Fees will be payable and authorized in advance by Client for AbundaBox™ to ACH Debit the assigned receivable bank account immediately upon receipt by the Client of the reimbursement.

3.2.    Any additional invoice for other Services and Products not represented within the above listed Fee that is not paid in full within ten (10) days of its receipt by the Client will bear interest at the lesser of (a) the rate of five percent (5%) per month and (b) the highest rate permissible under applicable law, calculated daily and compounded monthly. Client shall also reimburse AbundaBox™ for all costs incurred in collecting any late payments, including, without limitation, attorneys' fees. In addition to all other remedies available under this Agreement or at law (which AbundaBox™ does not waive by the exercise of any rights hereunder), AbundaBox™ shall be entitled to suspend the provision of any Services or Products immediately if the Client fails to pay any amounts when due hereunder and such failure will be followed immediately with a written notice thereof.

3.3.    Client shall be responsible for all sales, use, and excise taxes, and any other similar taxes, duties and charges of any kind imposed by any federal, state or local governmental entity on any amounts payable by Client hereunder; and to the extent AbundaBox™ is required to pay any such sales, use, excise, or other taxes or other duties or charges, Client shall reimburse AbundaBox™ in connection with its payment of such fees and expenses. Notwithstanding the previous sentence, in no event shall Client pay or be responsible for any taxes imposed on, or regarding, AbundaBox™'s income, revenues, gross receipts, personnel, or real or personal property or other assets.

4.    <u>Client Representations & Warranties</u>. Client represents and warrants to AbundaBox™ that its use of the Services shall comply with all applicable laws, statutes, ordinances, codes, rules, regulations, orders, judgments, decrees, standards, requirements, or procedures enacted, adopted, applied, enforced, or followed now or in the future by any federal or state governmental bodies or agencies. Client further represents and warrants to AbundaBox™ that it has obtained all necessary consents, rights, and permissions to enter into this Agreement and use the Services in accordance with the terms of this Agreement. AbundaBox™, will frequently, and no less than quarterly, update Client to continuously drive compliance adherence and awareness.

5.    <u>Compliance With Laws</u>. AbundaBox™ shall comply with the Business Associate requirements of the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), as amended from time to time, and related and amended laws, rules and regulations relating to the uses and disclosures of Protected Health Information, as defined by HIPAA, in accordance with the terms of the Business Associate Agreement, in the form attached as Exhibit C, which shall be executed by the Parties and constitute part of this Agreement. Each Party shall comply with all laws, regulations, and government orders that have the effect of law that apply to the Party in connection with its obligations under this Agreement ("**Applicable Law**").

6.    <u>Limitation of Liability</u>.

6.1.    EXCEPT FOR CLAIMS ARISING FROM OR RELATING TO AN INFRINGEMENT, MISAPPROPRIATION OR VIOLATION OF THE INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY BY CLIENT, THE PARTIES AGREE ANY AND ALL LIABILITY OF EACH TO THE OTHER FOR ANY AND ALL DAMAGES WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT FROM ANY CAUSE, INCLUDING BUT NOT LIMITED TO NEGLIGENCE, ERRORS, OMISSIONS, STRICT LIABILITY, BREACH OF CONTRACT OR BREACH OF WARRANTY SHALL NOT, IN THE AGGREGATE, EXCEED THE LESSER OF: (I) THE FEES PAID OR PAYABLE TO ABUNDABOX™ UNDER THIS AGREEMENT; OR (II) FIFTY THOUSAND DOLLARS ($50,000).

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

6.2.   IN NO EVENT WILL ABUNDABOX™, ITS OFFICERS, DIRECTORS, AFFILIATES, AGENTS, OR LICENSORS BE LIABLE TO CLIENT OR ANY USER FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING AND WITHOUT LIMITATION, LOSS OF REVENUE, LOSS OF PROFITS, LOSS OF DATA, PATIENT COMPROMISE, OR BUSINESS INTERRUPTION ARISING OUT OF THIS AGREEMENT OR THE CLIENT OR ANY USER'S USE OR INABILITY TO USE THE SERVICES.

7.   AbundaBox™ is not liable for any injury and/or damage to persons or property as a result of Client's use of the Services or from any use or operation of any ideas, instructions, methods, products, or procedures provided in connection with the Services. If the content provided in connection with the Services contains medical or health sciences information, it is intended for professional use within the medical field and is not to be considered medical advice or relied upon in any way for any treatment decision by a medical professional or otherwise. No suggested test or procedure should be carried out unless, in the Client's and the user's judgment, its risk is justified. Because of rapid advances in the medical sciences, independent verification of diagnoses and drug dosages should be made by the medical professional. Discussions, views, and recommendations as to medical procedures, products, choice of drugs, and drug dosages are the sole responsibility of the Client and user.

8.   <u>Disclaimer</u>.

8.1.   ABUNDABOX™ SPECIFICALLY DISCLAIMS, AND THE CLIENT WAIVES, ANY EXPRESS OR IMPLIED STANDARDS, GUARANTEES OR WARRANTIES, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, CUSTOM OR USAGE, OR OTHERWISE AS TO ANY GOODS OR SERVICES THAT ARE THE SUBJECT OF THIS AGREEMENT. ABUNDABOX™ DOES NOT WARRANT THAT THE SERVICES WILL FUNCTIONALLY MEET CLIENT'S REQUIREMENTS, THAT THE OPERATION OF THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE OR THAT DEFECTS IN THE SERVICES WILL BE CORRECTED. FURTHERMORE, ABUNDABOX™ DOES NOT WARRANT OR MAKE ANY REPRESENTATIONS REGARDING THE USE OR RESULTS OF THE USE OF THE SERVICES IN TERMS OF ITS CORRECTNESS, ACCURACY, RELIABILITY OR OTHERWISE. CLIENT AGREES THAT THE USE OF THE SERVICES IS AT CLIENT'S OWN RISK. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY ABUNDABOX™ HEREUNDER SHALL CREATE A WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF ANY WARRANTY. SOME JURISDICTIONS MAY NOT ALLOW THE EXCLUSION OF CERTAIN IMPLIED WARRANTIES, SO THE ABOVE EXCLUSION MAY NOT FULLY APPLY TO CLIENT, IN WHICH CASE THE PARTIES EXPRESSLY AGREE THAT THE EXCLUSION SHALL APPLY TO THE FULLEST EXTENT PERMISSIBLE BY LAW.

9.   <u>Intellectual Property</u>.  All intellectual property rights, including copyrights, patents, patent disclosures and inventions (whether patentable or not), trademarks, service marks, trade secrets, know-how and other confidential information, trade dress, trade names, logos, corporate names and domain names, together with all of the goodwill associated therewith, derivative works and all other rights (collectively, "**Intellectual Property Rights**") in and to all documents, work product and other materials that are delivered to Client under this Agreement or prepared by or on behalf of the AbundaBox™ in the course of performing the Services (collectively, the "**Deliverables**") except for any Confidential Information of Client shall be owned by AbundaBox™.  AbundaBox™ hereby grants Client a license to use all Intellectual Property Rights in the Deliverables free of additional charge and on a non-exclusive, worldwide, non-transferable, non-sublicensable, fully paid-up, royalty-free and perpetual basis to the extent necessary to enable Client to make reasonable use of the Deliverables and the Services.

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

10. <u>Ownership of Client Data</u>. Notwithstanding any other term of this Agreement, except for allowable de-identified data, all Client Data is the property of Client. All such Client data shall be returned to Client by AbundaBox™ within thirty (30) days of termination of this Agreement for any reason, in a mutually agreeable format, subject to any and all obligations and limitations specified in the Business Associate Agreement.

11. <u>Indemnification</u>. Each Party shall and hereby agrees to defend, indemnify, and hold harmless the other Party and each of their officers, directors, employees, and agents (each an "**Indemnified Party**") against and in respect of any and all damage, loss, liability, obligation, claim, demand, judgment, settlement, and expense (including without limitation reasonable expenses of investigation and reasonable attorneys' fees and any expenses incurred in connection with the enforcement of the rights of an Indemnified Party pursuant to this Agreement) caused by or arising out of (i) a claim that any information delivered to the Indemnified Party by the other Party violates a United States patent, trademark, or copyright, or (ii) the inaccuracy or untruth of any representation or warranty of either Party in this Agreement.

12. <u>Confidentiality</u>. From time to time during the Term of this Agreement, either Party (as the "**Disclosing Party**") may disclose or make available to the other Party (as the "**Receiving Party**"), non-public, proprietary, and confidential written, oral, electronic, digital, or other information received from a Party which is marked or identified as confidential, or that under the circumstances should reasonably be regarded as confidential, including, but not limited to, the other Party's proprietary or business information, the other Party's trade secrets, the Licensed Software, other vital data regarding a Party's business, and the terms and provisions of this Agreement, including, without limitation, the pricing terms set forth in or related to this Agreement ("**Confidential Information**"); provided, however, that Confidential Information does not include any information that: (a) is or becomes generally available to the public other than as a result of Receiving Party's breach of this Section 12; (b) is or becomes available to the Receiving Party on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information; (c) was in Receiving Party's possession prior to Disclosing Party's disclosure hereunder; or (d) was or is independently developed by Receiving Party without using any Confidential Information. The Receiving Party shall: (x) protect and safeguard the confidentiality of the Disclosing Party's Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care; (y) not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than to exercise its rights or perform its obligations under this Agreement; and (z) not disclose any such Confidential Information to any person or entity, except to the Receiving Party's Group (defined below) who need to know the Confidential Information to assist the Receiving Party, or act on its behalf, to exercise its rights or perform its obligations under this Agreement. The Parties will cooperate to ensure that any Confidential Information that contains personal data will be transferred in accordance with current industry best standards and all applicable laws and regulations pertaining to the protection of personal data.

If the Receiving Party is required by applicable law or legal process to disclose any Confidential Information, it shall, prior to making such disclosure, use commercially reasonable efforts to notify Disclosing Party of such requirements to afford Disclosing Party the opportunity to seek, at Disclosing Party's sole cost and expense, a protective order or other remedy. For purposes of this Section 12 only, "**Receiving Party's Group**" shall mean the Receiving Party's affiliates and its or their employees, officers, directors, managers, agents, service providers, sublicensees, subcontractors, attorneys, accountants, and financial advisors.

13.     Term, Termination, and Survival.

13.1.    This Agreement shall commence as of the Effective Date and shall continue thereafter until the completion of the Services under all Statements of Work unless sooner terminated pursuant to Section 13.2 or Section 13.3.

13.2.    Either Party may terminate this Agreement, effective upon written notice to the other Party (the "**Defaulting Party**") if the Defaulting Party:

(a)     Materially breaches this Agreement, and the Defaulting Party does not cure such breach within thirty (30) days after receipt of written notice of such material breach, or such material breach is incapable of cure.

(b)     Becomes insolvent or admits its inability to pay its debts generally as they become due.

(c)     Becomes subject, voluntarily, or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not fully stayed within seven (7) business days or is not dismissed or vacated within forty-five (45) business days after filing.

(d)     Is dissolved or liquidated or takes any corporate action for such purpose.

(e)     Makes a general assignment for the benefit of creditors.

(f)     Has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

13.3.    Notwithstanding anything to the contrary in Section 13.2(a), AbundaBox™ may terminate this Agreement before the expiration date of the Term on written notice if Client fails to pay any amount when due hereunder and such failure continues for 90 days after Client's receipt of the applicable invoice.

13.4.    Upon termination of this Agreement for any reason other than AbundaBox™'s material breach, Client agrees to pay AbundaBox™ in full for all goods and/or Services provided to Client under this Agreement in accordance with the applicable Service Order and any resulting invoice.

13.5.    The rights and obligations of the Parties set forth in this Section 13 and in Sections 3 and 6-14, and any right or obligation of the Parties in this Agreement which, by its nature, should survive termination or expiration of this Agreement, will survive any such termination or expiration of this Agreement.

14.     Miscellaneous.

14.1.    Entire Agreement.   This Agreement, including and together with any related Statements of Work, exhibits, schedules, attachments, and appendices, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding such subject matter.  The parties acknowledge and agree that if there is any conflict between the terms and conditions of this Agreement and the terms and conditions of any Statement of Work, the terms and conditions of this Agreement shall supersede and control.

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

14.2.    Notices.  All notices, requests, consents, claims, demands, waivers, and other communications under this Agreement (each, a "**Notice**", and with the correlative meaning "**Notify**") must be in writing and addressed to the other Party at its address set forth below (or to such other address that the receiving Party may designate from time to time in accordance with this Section).  Unless otherwise agreed herein, all Notices must be delivered by personal delivery, nationally recognized overnight courier or certified or registered mail (in each case, return receipt requested, postage prepaid).  Except as otherwise provided in this Agreement, a Notice is effective only (a) on receipt by the receiving Party; and (b) if the Party giving the Notice has complied with the requirements of this Section 14.2.

Notice to Client:                          Quickmed, LLC
                                           5100 Belmont ave suite 5
                                           Youngstown Ohio 44505

                                           Attention: Lena Esmail

Notice to AbundaBox™:                      SOS AbundaBox

                                           10394 W Chatfield Ave, Suite 108
                                           Littleton, Colorado 80127

                                           Attention: Emily Jones

14.3.    Severability.  If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction[; provided, however, that if any fundamental term or provision of this Agreement, is invalid, illegal or unenforceable, the remainder of this Agreement shall be unenforceable.  Upon a determination that any term or provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement to affect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

14.4.    Amendments.  No amendment to or modification of this Agreement is effective unless it is in writing, identified as an amendment to this Agreement and signed by each Party.

14.5.    Waiver.  No waiver by any Party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the Party so waiving.  Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

14.6.    Assignment.  Client may not assign, transfer, delegate, or subcontract any of its rights or delegate any of its obligations under this Agreement without the prior written consent of AbundaBox™.  Any purported assignment or delegation in violation of this Section 14.6 shall be null and void.  No assignment or delegation shall relieve the Client of any of its obligations under this Agreement.

14.7.    Successors and Assigns.  This Agreement is binding on and inures to the benefit of the Parties to this Agreement and their respective permitted successors and permitted assigns.

14.8.   <u>Relationship of the Parties</u>.  The Parties intend that AbundaBox™, in performing the Services specified in this Agreement, shall act as an independent contractor, and shall have full control of the work and the manner in which it is performed. AbundaBox™ and its employees are not to be considered agents or employees of Client for any purpose.

14.9.   <u>No Third-Party Beneficiaries</u>.  This Agreement benefits solely the Parties to this Agreement and their respective permitted successors and assigns and nothing in this Agreement, express or implied, confers on any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

14.10.   <u>Choice of Law</u>.   The substantive laws of the State of Colorado govern this Agreement, irrespective of its choice of law principles. The Parties agree that jurisdiction and venue for any matter arising out of or pertaining to this Agreement is proper only in the state and federal courts located in the State of Colorado, United States of America. Both Parties hereto consent to jurisdiction of such courts and waive any objections they have or may have to jurisdiction of and/or venue in such courts.

14.11.   <u>Arbitration</u>.  THE AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF COLORADO WITHOUT REGARD TO CHOICE OF LAW PRINCIPLES.   EXCEPT FOR CLAIMS FOR INJUNCTIVE RELIEF, AS DESCRIBED BELOW, ANY PAST, PRESENT, OR FUTURE CONTROVERSY OR CLAIM ARISING OUT OF OR RELATED TO THE AGREEMENT SHALL BE BROUGHT IN THE STATE OF COLORADO AND SHALL BE RESOLVED BY BINDING ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION UNDER ITS COMMERCIAL ARBITRATION RULES, INCLUDING, IF APPLICABLE, THE SUPPLEMENTARY PROCEDURES FOR THE RESOLUTION OF CONSUMER RELATED DISPUTES. CONSOLIDATED OR CLASS ACTION ARBITRATIONS SHALL NOT BE PERMITTED. THE ARBITRATOR OF ANY DISPUTE OR CLAIM BROUGHT UNDER OR IN CONNECTION WITH THE AGREEMENT SHALL NOT HAVE THE POWER TO AWARD INJUNCTIVE RELIEF; INJUNCTIVE RELIEF MAY BE SOUGHT SOLELY IN AN APPROPRIATE COURT OF LAW. NO CLAIM SUBJECT TO ARBITRATION UNDER THE AGREEMENT MAY BE COMBINED WITH A CLAIM SUBJECT TO RESOLUTION BEFORE A COURT OF LAW. THE ARBITRABILITY OF DISPUTES SHALL BE DETERMINED BY THE ARBITRATOR. JUDGMENT UPON AN AWARD MAY BE ENTERED IN ANY COURT HAVING COMPETENT JURISDICTION. IF ANY PORTION OF THIS SECTION IS HELD TO BE UNENFORCEABLE, THE REMAINDER SHALL CONTINUE TO BE ENFORCEABLE.

14.12.   <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

14.13.   <u>Force Majeure</u>.  Neither Party shall be liable to the other for failure to perform its obligations hereunder if and to the extent that such failure to perform is caused by forces beyond its reasonable control, including without limitation, epidemics or pandemics,  acts of God, actions or inactions of any governmental agencies, changes in law, strikes, lockouts, or other industrial disturbances, negligent acts or omissions of third-parties, civil disturbances, fires, floods, earthquakes, acts of a public enemy or terrorism.  If a Party is so impacted, in whole or in part, such Party will promptly notify the other Party in writing, explaining the reason for the delay.  In the event of a force majeure event the time and costs of performance will be modified. Client may request a payment grace period wherein payment obligations hereunder will continue but disbursement may be postponed. AbundaBox™ shall not unreasonably withhold its approval of said grace period request.

[signature page follows]

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date by their respective duly authorized officers.

**"CLIENT"**

Quickmed, LLC

By _____
     Lena Esmail

Name: _____

Title: CEO _____


**"ABUNDABOX™"**

SOS AbundaBox, LLC
a Wyoming Limited Liability Company

By _____

Name: Emily Jones

Title: CEO

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

# Exhibit A

## Statement of Work - Health Pack Program

The services, prices and terms on this Service Order constitute AbundaBox™'s offer to provide such services on such terms. Until Client has accepted this offer by signing as appropriate below, AbundaBox™ reserves the right to rescind this offer at any time, at its sole discretion.

| | |
|---|---|
| Provider Name: | SOS AbundaBox LLC (d/b/a AbundaBox™) |
| Client Name: | Quickmed, LLC |
| Products: | Health Pack, We Care Program, ACP Connectivity, AbundaCheck™, & Food Program |
| Start Date: | 9/8/23 |

Upon execution of this Service Order, AbundaBox™ will provide Client with the services described herein ("**Services**").

15.      Services; Project Scope

     15.1.     Overview:

AbundaBox™ has affiliates and subcontractors with demonstrated expertise in call center and administrative operations to facilitate contact with Client's customers who receive benefits ("**Recipients**") and provide information about, and an option to enroll in, AbundaBox™'s subscription services for one or more of the Products. Client is therefore contracting AbundaBox™ to engage with Client's Recipients and provide the services as described herein.

     15.2.     Services/ Project Scope:

Client may utilize AbundaBox™ for one or more of the following services:

         (a)     Call Center Management. Client will provide API data loads or other agreed upon HIPAA compliant loads of customer data for the Identified Recipients into the AbundaBox™ telephony system. AbundaBox™, or its subcontractors, will provide knowledgeable and customer friendly staff to accept inbound calls placed by Recipients and to place outbound calls to Recipients, following an approved script, to offer monthly Services for one or more of the Products, available through Client. AbundaBox™ will document interaction within the AbundaBox™ and AbundaCheck™ Proprietary HIPAA compliant system of record (**"AbundaTech™"**). For any outbound calls that are not connected, AbundaBox™ will leave a voicemail or message, following an approved script. All call attempts will be tracked and logged in the AbundaTech™ system. A total of three (3) attempts, with voicemails, will be made to reach the initial designated set of Recipients. If a return call is made by Recipient requesting to not be contacted, no further attempts to contact will be made. For any outbound calls that are not connected returning a customer service question that is not regarding an enrollment attempt AbundaBox™ will leave a single (1) voicemail or message, following an approved script. All call attempts will be tracked and logged in the AbundaTech™ system.

         (b)     Products and Shipping. AbundaBox™, or its subcontractors, will package the Products and will manage all shipping and handling for Products subscribed for by Recipient.

(c)    Consultation and Billing.  If Client is not managing billing, an AbundaBox™ and Client authorized subcontractor outlined in Exhibit D, will submit all claims for reimbursement for subscription Products ordered by, and or serviced and maintained, and/or shipped to Recipients. Please refer to Exhibit D for details with our Third-Party Medical Billing partner.

15.3.    Deliverables:

All services are to be delivered by AbundaBox™ on a time and materials basis with a high degree of accuracy, quality, timeliness, and productivity. Reasonable expectations of productivity for all work categories, as well as management oversight ratios, are defined below:

15.4.    Fees:

Fees will be payable to AbundaBox™ in accordance with the Fee Schedule included in this Statement of Work, Exhibit B.

Client agrees to setup and authorize both AbundaBox™ and Independent Third-Party Medical Clearing House to access account data in real time via online bank approved access to maintain the most current and accurate reporting and reconciliation compliance. Fees will be payable and authorized in advance by Client for AbundaBox™ to ACH Debit the assigned bank account immediately upon receipt by the Client of the reimbursement.

16.    Responsibilities

16.1.    AbundaBox™ Responsibilities:

AbundaBox™ will be responsible for the following:
- Compliance with all HIPAA and privacy requirements and compliance with billing and payor policy
- Ongoing training of additional staff beyond initial program implementation
- Maintaining secure access to all systems provided by Client
- Ongoing quality assurance audits and resolution
- Providing second-level support for all complex questions, issues, or escalations

16.2.    Client Responsibilities:

Client will be responsible for the following:
- Initial connections to Client platform and facilitation of approval of content, and or secure data transmission of requested Recipient information via the HIPAA secure portal provided by AbundaTech™, script, and IVR messaging review and approval if required by Client
- Providing Recipient contact information as needed
- Providing AbundaBox™ with access to all required systems
- Should Client prefer, AbundaBox™ will provide a secure portal and/or transmission system. if your team would prefer.
- Collecting and providing AbundaBox™ with accurate Recipient demographics for all new Recipients following the Parties' agreed upon method of secure HIPAA data upload to AbundaTech™.
- Resolve ineligible Recipient issues

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

- Resolve all questions, requests, and support needed to facilitate Third-Party Medical Billing Clearing House to rectify any and all eligibility questions, disputes, and challenges per the agreement in Exhibit D.

17.    Payment

17.1.    ACH Account:

(a)    Invoicing shall be in accordance with the Fee Schedule in Exhibit B of this Agreement. Client agrees to net thirty (30) day terms from the time of shipment and/or fulfillment of any of the Products or Services agreed to in the Exhibit B Table. AbundaBox$^{TM}$ will send over a daily reconciliation file accounting to all services rendered for review.

(b)    Client grants access to AbundaBox$^{TM}$ to view transaction activity on the ACH Account for purpose of validating and dual control regarding the reconciliation reporting provided to the Client for AbundaBox$^{TM}$ and AbundaCheck$^{TM}$ Services rendered.

18.    Assumptions

The Services, Deliverables, and Pricing detailed in this SOW were prepared based on the assumptions and dependencies below:

(1) AbundaBox$^{TM}$ is responsible for the overall success of the Products, as specified in this Statement of Work. The responsibilities of Client with respect to the overall success of the Services, Deliverables, and Documentation are set forth in this Order.

(2) AbundaBox$^{TM}$ will perform all work at an AbundaBox$^{TM}$ facility, remotely, or utilizing an authorized subcontractor. All Call Center Services performed by AbundaBox$^{TM}$ shall only be performed by citizens of the United States of America (USA).

(3) If AbundaBox$^{TM}$ reasonably believes that any of the Client Responsibilities specified herein have not been fully and timely performed, and this is likely to have any negative impact on the successful and timely completion of delivery of the Product as outlined in this Statement of Work, or AbundaBox$^{TM}$'s Services, AbundaBox$^{TM}$ will promptly  provide notice to Client, describing in reasonable detail (a) the nature and extent of the perceived failure; (b) the estimated impact to AbundaBox$^{TM}$'s ability to perform the services; and (c) the steps AbundaBox$^{TM}$ believes that Client should take to put the Product delivery back on schedule.   Pending Client's consideration of AbundaBox$^{TM}$'s notice of a perceived Client failure, AbundaBox$^{TM}$ will continue performing the Services and assist Client to minimize the impact of Client's perceived failure.

(4) AbundaBox$^{TM}$ will provide a notice to Client if it becomes aware of any problems, conflicts, or performance implications regarding the successful delivery of the designated Client selected Products assigned in this Statement of Work.

19.    Agreement and Acceptance

THIS SERVICE ORDER INCORPORATES BY REFERENCE THE TERMS AND CONDITIONS HEREIN. BY EXECUTING THIS SERVICE ORDER, CLIENT ACKNOWLEDGES THAT CLIENT ACCEPTS AND AGREES TO BE BOUND BY THE TERMS AND CONDITIONS.

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

# Exhibit B
## Fee Schedule

|   | Product | Price Per Unit | Frequency |
|---|---------|----------------|-----------|
| A. | AbundaBox$^{TM}$ – HealthPack Chronic Condition Covid Care | $84.00 per AbundaBox$^{TM}$ (shipped) | Monthly |
| B. | We Care Solution Rapid Antigen Test | $47.00 per AbundaBox$^{TM}$ (shipped) | As Requested, or Prescribed |
| C. | We Care Solution Molecular Test | $104.00 per Kit (shipped) | As Requested, or Prescribed |
| D. | AbundaCheck$^{TM}$ Cognitive Assessment Tool and Interpretation | $156.00 per eligible user per month | As Requested, or Prescribed |

*Reimbursement rates, stipulations, requirements, and cancelation are subject to Insurance Provider

Minimum Billing: Implementation cost of $20 per participant in AbundaBox$^{TM}$ estimated at 20% of the supplied participant list **("Supplied List")**: Supplied List of 20,000 for the call center at 20% is 4,000. At $20 per 4,000 implementations, $80,000 is the deferred minimum billing but will be counted against the first 60 days of the Agreement. Using the same model, a list of 20,000 may only generate a $480,000 in monthly revenue with a SOS receivable of $400,000, with a profit margin of $80,000 a month.

A. AbundaBox™ Health Pack by Summit One Source (SOS) will contain up to a total of 8-Test Kits each month of FDA or FDA EUA, Rapid Antigen and or Molecular Test Kits with a current expiry date (or equivalent Test Kit). The volume of Test Kits included is based on End-User's qualifications, request, or prescription. This service only applies to qualified Recipients that have been authorized via an approved and pre-authorized eligibility approval for the provision of the kits. This is a point in time validation of eligibility and subject to change without notification and will be re-validated monthly for the foreseeable future. Should Recipient's eligibility change following the monthly eligibility approval during which AbundaBox™ has shipped the Product, any and all losses will be the sole responsibility of the Client.

B. Food EBT Card, Delivered Meals, or other approved Meal sources will be issued (with funds based on qualifications) and replenished per the approved time frequency for the allowance if Recipient is eligible and approved. This service will only be verified once during Recipient's Food Card eligibility review and setup. Funding and maintenance of this allowance is provided by the authorized benefit provider. Additional services including, but not limited to, education and balance prompts may be added.

C. Additional authorized testing resources may be utilized per the request of the Recipient or a validated prescriber. Authorized testing resources will be expedited as necessary to the participant. All IFU (Instructions for Use) enclosed within the product packaging must be adhered to by the Recipient. SOS does not accept liability for misuse of the product, tampering with, or any other unintended use.

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

All requirements per the testing resource classification must be strictly adhered to for compliance and to ensure that the results are administered adhering to all applicable requirements.

D.  If applicable per Recipient, Remote Patient Monitoring (RPM), typical qualifying devices: Fall Detection Device, Blood Pressure Cuff, Glucometer, Sepsis, PTSD, Depression, & Weight Scale. Based on qualification, eligibility, and approval Recipient's may be provided one or more of these devices and services. Reimbursement is based on the Recipient's approved eligibility. Depending on the RPM service and/or device other stipulations and requirements may apply.

E.  Supplies cannot be guaranteed.

F.  Test kit problems may also be reported to the FDA through the MedWatch medical products reporting program (Phone: 800.FDA.1088; Fax: 800.FDA.0178; http://www.fda.gov/medwatch).

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

# EXHIBIT C

## BUSINESS ASSOCIATE AGREEMENT

The Parties shall comply with their BAA obligations in conjunction with their duties under the Underlying Agreement.

1.      Definitions.

1.1.      General Statement. The following terms used in this BAA will have the same meaning as those terms in the HIPAA Rules: Administrative Safeguards, Availability, Breach, Business Associate, Confidentiality, Covered Entity, Data Aggregation, Designated Record Set, Disclosure, Electronic Protected Health Information ("**EPHI**"), Health Care Operations, Individual, Individually Identifiable Health Information, Integrity, Minimum Necessary, Physical Safeguards, Protected Health Information ("**PHI**"), Required by Law, Secretary, Security Incident, Subcontractor, Technical Safeguards, Unsecured PHI, Uses and Disclosures, and Workforce. A change to the Privacy Laws which modifies any defined term, or which alters the regulatory citation for the definition will be deemed incorporated into this BAA.

1.2.      "Breach Notification Rule" means Part 2, Subtitle D of HITECH and Notification in the Case of Breach of Unsecured Protected Health Information at 45 C.F.R. Part 164 Subpart D.

1.3.      "Privacy Rule" means the standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Part 160 and Subparts A and E of Part 164.

1.4.      "Security Rule" means the Security Standards for the Protection of Electronic Protected Health Information at 45 C.F.R. Part 160 and Subparts A and C of Part 164.

2.      Status of Parties. Business Associate (i.e., SOS Events) hereby acknowledges and agrees that Customer is either a "Business Associate" of Customer's client or a "Covered Entity" and that Business Associate is either a "Subcontractor" or "Business Associate" of Customer, as such quoted terms are defined in the HIPAA Rules.

3.      Scope. This BAA is hereby incorporated into, the customer services agreement between Business Associate and Customer, including the exhibits and other addenda incorporated therein (collectively, the "**Underlying Agreement**") that provide for Business Associate's creation, receipt, maintenance, access, transmission, Use, or Disclosure of PHI, in any form or medium, including EPHI, in Business Associate's capacity as a "Business Associate" or "Subcontractor," as applicable, of Customer. Capitalized terms used in this BAA that are not otherwise defined in this BAA have the meaning set forth in the Master Terms.

4.      Business Associate Obligations.

4.1.      Data Use and Disclosure.

Limits on Use and Disclosure. Except as otherwise provided by this BAA, Business Associate may only Use and Disclose the PHI to perform the Services for, or on behalf of, Customer as set forth in the Underlying Agreement, *provided that* such Use or Disclosure, if made by the Customer, would not violate the HIPAA Rules. Business Associate agrees to make Uses, Disclosures and requests for PHI consistent with the Privacy Rule's Minimum Necessary requirements. Additionally, Business Associate may:

(a) Use PHI for its own proper management and administration or to carry out its legal responsibilities; provided that Business Associate may disclose PHI to its employees or contractors only if Business Associate (i) advises the employees of Business Associate's obligations under this Agreement and of the consequences to the employees and Business Associate for violating such obligations, and (ii) takes appropriate disciplinary action against any employee who uses or discloses PHI in violation of this Agreement; and

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

(b) Disclose PHI for its own proper management and administration or to fulfill any of its legal responsibilities, *provided that* (i) Disclosures are Required by Law, or (ii) Business Associate obtains reasonable assurances from the third party to whom the information is disclosed that such PHI will be (x) held secure and confidential as provided pursuant to this BAA and will only be used or further disclosed for the purpose which it was disclosed to such third party or as may otherwise be Required by Law, and (y) that such third party agrees to notify Business Associate of any Breach involving Unsecured PHI or Security Incidents which result in a Use or Disclosure of EPHI that becomes known to such third party.

4.2.    Safeguards and Third Parties. Business Associate will use appropriate Administrative, Physical and Technical Safeguards pursuant to the HIPAA Rules to prevent the Use or Disclosure of PHI other than pursuant to the terms and conditions of this BAA, the Underlying Agreement, or as Required by Law and to reasonably and appropriately protect the Confidentiality, Integrity, and Availability of PHI that Business Associate creates, receives, maintains, accesses, or transmits, on behalf of Customer. Business Associate further agrees to ensure that any agent, including a Subcontractor that creates, receives, maintains, accesses, or transmits PHI on behalf of Business Associate agrees in writing to substantially similar restrictions and conditions that apply to Business Associate with respect to such information.

4.3.    Reporting Unauthorized Uses, Breaches, and Security Incidents. Business Associate will notify Customer in writing, within 15 business days after becoming aware of: (a) any Use or Disclosure of PHI that is not authorized by this BAA or the Underlying Agreement; (b) any Breach involving Unsecured PHI; or (c) any Security Incident that results in a Use or Disclosure of EPHI in violation of this BAA or the Underlying Agreement. For Security Incidents that do not result in a Use or Disclosure of EPHI in violation of this BAA or the Underlying Agreement, this Section 4.3 (*Reporting Unauthorized Uses, Breaches, and Security Incidents*) will be deemed as notice to Customer that Business Associate periodically receives unsuccessful attempts for unauthorized access, Use, Disclosure, modification or destruction of information or interference with the general operation of Business Associate's information systems and the Services and, even if such events are defined as a Security Incident under the HIPAA Rules, Business Associate will not provide any further notice regarding such unsuccessful attempts.

4.4.    Mitigation. Business Associate will mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a Use or Disclosure of PHI by Business Associate, its agents or Subcontractors, if any, in violation of the requirements of this BAA, the Underlying Agreement, or the Privacy Laws. Business Associate will further take prompt action to mitigate, to the extent practicable, harmful effects of Security Incidents and Breaches involving Unsecured PHI, *provided that* such harmful effects are known to Business Associate.

4.5.    Sanctions. Business Associate will apply appropriate sanctions against any Workforce member, agent, or Subcontractor who uses or discloses PHI in violation of the Underlying Agreement, this BAA, or the Privacy Laws.

4.6.    Access to PHI. In the event that the PHI in Business Associate's possession constitutes a Designated Record Set, Business Associate will promptly, but no more than 15 business days, make available to Customer access to the PHI so that Customer (or, if Customer is a Business Associate, the Covered Entity on whose behalf Customer is acting) may meet the requirements of 45 C.F.R. § 164.524. As between Business Associate and Customer, Customer is responsible for responding to Individuals' request for access to PHI. In the event any Individual delivers a request for access to PHI directly to Business Associate, Business Associate will promptly forward such request to Customer.

4.7.    Amendment of PHI. In the event that the PHI in Business Associate's possession constitutes a Designated Record Set, Business Associate will promptly, but no more than 15 business days, make available to Customer access to the PHI so that Business Associate (or, if Customer is a Business Associate, the Covered Entity on whose behalf Customer is acting) may incorporate any amendment(s) to the PHI in accordance with 45 C.F.R. § 164.526. As between Business Associate and Customer, Customer is responsible for responding to Individuals' request for amendment of PHI. In the event any Individual delivers a request for amendment of PHI directly to Business Associate, Business Associate will promptly forward such request to Customer.

4.8.     Accounting of Disclosures of PHI. Business Associate will document all Disclosures of the PHI and such other information related to the Disclosure of PHI as may reasonably be necessary for Customer (or, if Customer is a Business Associate, the Covered Entity on whose behalf Customer is acting) to respond to any request by an Individual for an accounting of Disclosures of PHI in accordance with 45 C.F.R. § 164.528. Within 15 business days of notice by Customer to Business Associate that Customer has received a request for an accounting of Disclosures of PHI regarding an Individual, Business Associate will make available to Customer information to permit Customer (or, if Customer is a Business Associate, the Covered Entity on whose behalf Customer is acting) to respond to the request for an accounting of Disclosures of PHI. In the event any Individual delivers a request for an accounting of Disclosures of PHI directly to Business Associate, Business Associate will promptly forward such request to Customer.

4.9.     Restrictions. Business Associate will comply with any restrictions on Disclosure of PHI requested by an Individual and agreed to by Customer in accordance with 45 C.F.R. § 164.522 and HITECH § 13405(a).

4.10.    Availability of Books and Records. To the extent required by law, and subject to applicable attorney-client privileges, Business Associate will make its internal practices, books, and records available to the Secretary for purposes of determining Customer's compliance with the Privacy Laws.

4.11.    De-identified Data. Business Associate may de-identify PHI in accordance with the standards set forth in 45 C.F.R. § 164.514(b) and may use or disclose such de-identified data for any reason not prohibited by applicable law if the de-identified health information meets the standard and implementation specifications for deidentification under 45 C.F.R. § 164.514(a) and (b) ("De-identified Data").  Business Associate shall own all right, title and interest in and to the De-identified Data.

5.      Obligations of Customer.

5.1.     Security of PHI. Customer agrees and understand that the security of PHI requires the reasonable cooperation of both Parties. Accordingly, Customer will use commercially reasonable efforts to secure the Customer-side environment, by, for example, training Workforce members, securing and using strong passwords, using secure connections, and other similar Customer-side Administrative, Physical, and Technical Safeguards.

5.2.     Notice of Privacy Practices. Customer will notify Business Associate, in writing, of any limitation(s) in the Customer's (or, if Customer is a Business Associate, the Covered Entity on whose behalf Customer is acting) Notice of Privacy Practices, to the extent that such limitation may affect Business Associate.

5.3.     Restrictions. Customer will notify Business Associate, in writing, of any restriction to the Use or Disclosure of PHI that Customer has agreed to or must comply with in accordance with 45 C.F.R. § 164.522 and HITECH § 13405(a), to the extent that such restriction may affect Business Associate.

5.4.     Changes in Authorization. Customer will notify Business Associate of any changes in, or revocation of, the permission by an Individual to Use or Disclose of such Individual's PHI, to the extent that such changes may affect Business Associate.

5.5.     Compliance with Laws. Customer will not request Business Associate to view Customer's PHI or to Use or Disclose PHI in any manner that would not be permissible under the Privacy Laws if done by Customer.

5.6.     End Users.  Customer agrees and understands that Customer and not Business Associate, is responsible for managing whether Customer's end users are authorized to access, share, Disclose, create, and Use PHI and Business Associate will have no obligations relating thereto.

6.      Term and Termination.

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

6.1.    Term. The term of this BAA will be effective as of the BAA Effective Date and will terminate when all of the PHI is destroyed or returned to Customer, or, if it is not feasible to return or destroy the PHI, protections are extended to such information, in accordance with this BAA.

6.2.    Termination. Either Party may terminate this BAA in the event of a material breach of this BAA by the other Party. The termination will be effective 30 calendar days after a Party provides written notice of the material breach to the other Party and the Party receiving notice of the breach (a) has failed to remedy such breach, or (b) has failed to take substantial steps, to the reasonable satisfaction of the Party that provided notice, to remedy such breach. The termination will be effective immediately upon written notice in the event the Party providing notice reasonably believes that cure of the material breach is not feasible. A Party's option to have cured a material breach of this BAA will not be construed as a waiver of any other rights such Party has under this BAA, by operation of law, or in equity.

6.3.    Effect of Termination. Upon the termination of this BAA or the Underlying Agreement for any reason, Business Associate will return to Customer all PHI created, received or maintained by Business Associate or, at Business Associate's reasonable direction, destroy all PHI received from Customer that Business Associate maintains in any form, recorded on any medium, or stored in any storage system. This provision will apply to PHI that is in the possession of Business Associate, its agents or Subcontractors, if any. Business Associate and Customer will remain bound by the provisions of this BAA, even after termination of the Underlying Agreement or this BAA, until all PHI has been returned or otherwise destroyed as provided in this Section 6.3 (*Effect of Termination*). Notwithstanding the foregoing, Customer agrees and understands that the return of PHI stored in backup media is not feasible and that such PHI will be destroyed in the normal course of Business Associate's data management activities. Business Associate will not retain any copies of PHI, except as permitted herein, permitted by the Underlying Agreement, Required by Law, as may reasonably be necessary to comply with business recordkeeping requirements, or otherwise agreed to by the Parties in writing. Termination of this BAA will not relieve Customer of any monetary obligations set forth in the Underlying Agreement.

6.4.    Termination of Underlying Agreement. If the Underlying Agreement is terminated for any reason, this BAA will also terminate.

7.    General Terms.

7.1.    Regulatory References. A reference in this BAA to a section of the Privacy Laws, or the regulations issued thereunder, means the section or regulation as in effect or as amended, and for which compliance is required.

7.2.    Amendment; Waiver. This BAA may be amended or supplemented only by a writing that refers explicitly to this BAA and that is signed by both Parties. The Parties agree to amend this BAA as required to comply with any changes in laws, rules or regulations that affect the privacy and security of PHI and the Business Associate's duties under the Underlying Agreement or this BAA. No delay or failure of either Party to exercise any right or remedy available hereunder, at law or in equity, will act as a waiver of such right or remedy, and any waiver will not waive any subsequent right, obligation, or default.

7.3.    Entire Agreement. This BAA, together with the Underlying Agreement, contain the entire understanding between the Parties hereto and will supersede any other oral or written agreements, discussions and understandings of every kind and nature, with respect to the subject matter hereof.

7.4.    Order of Precedence. Any ambiguity in this BAA will be resolved to permit Business Associate to comply with the Privacy Laws. If any express term of this BAA conflicts with the Underlying Agreement, then this BAA, if applicable, will control as to that term, but only to the extent of an express ambiguity. The Underlying Agreement will control in all other instances, including, without limitation, remedies, limitation of liability, limitation of remedies, warranties, disclaimer of warranties, governing law, venue, and relationship of the Parties.

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

7.5.    No Third-Party Beneficiaries. Nothing express or implied in this BAA is intended to confer, nor will anything herein confer, upon any person other than Customer, Business Associate, or their respective successors or permitted assigns, any rights, remedies, obligations or liabilities whatsoever.

7.6.    Survival. The rights and obligations contained in <u>Sections 4.3</u> (*Reporting Unauthorized Uses, Breaches, and Security Incidents*), <u>4.4</u> (*Mitigation*), <u>4.8</u> (*Accounting of Disclosures of PHI*), <u>4.10</u> (*Availability of Books and Records*), <u>5.6</u> (*End Users*), <u>6.3</u> (*Effect of Termination*), and 7 (*General Terms*) will survive the termination of this BAA.

7.7.    Notices. All notices that either Party may desire or be required to give to the other will be in writing and will be delivered by overnight courier or by priority mail by a recognized express mail to the other Party at the address set forth in the signature page or such other address as a Party may provide. Notice delivered by facsimile or e-mail will be confirmed by overnight courier or by priority mail.

7.8.    Severability. If any provision of this BAA is determined by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions hereof will continue in full force and effect.

7.9.    Counterparts. This BAA may be executed in counterparts, each of which will be deemed an original, and all of which will constitute one binding agreement and may be delivered by electronic mail or fax.

<u>SOS AbundaBox, LLC</u>

Signature: _____

Name/Title: Emily Jones, CEO

DATE: 9/9/2023

<u>Quickmed, LLC</u>

Signature: _____

Name/Title: Lena Esmail    CEO

DATE: 9/9/2023

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

# EXHIBIT D

**SOS AbundaBox, LLC Master Services and License Agreement**

This **MASTER SERVICES AND LICENSE AGREEMENT** (this **"Agreement"**) is made and entered into by and between **SOS AbundaBox™, LLC**, a Wyoming company **("SOS"),** and **Quickmed, LLC ("Medical Service Provider" or "MSP")** to be effective as of August 28,2023 SOS and Medical Service Provider may also be referred to individually as a **"Party"** or collectively as the **"Parties".**

**Agreement Overview:**

**1. Services Provided:**
SOS ("Billing Services Provider") agrees to provide medical billing services to Quickmed, LLC ("Medical Service Provider"), including but not limited to the submission of claims and handling of billing-related activities.

**2. Utilization of NPI:**
The Medical Service Provider grants SOS permission to utilize their National Provider Identifier (NPI) number solely for the purpose of submitting claims and conducting billing activities on behalf of the Medical Service Provider.

**3. Compliance:**
Both parties agree to comply with all applicable laws, regulations, and guidelines related to medical billing, privacy, and data security. SOS shall take reasonable measures to protect the confidentiality of patient information and NPI.

**4. Compensation:**
In consideration for the billing services provided, the Medical Service Provider agrees to pay SOS a fee as outlined in the fee schedule attached as Exhibit A to this Agreement.

**5. Term and Termination:**
This Agreement shall commence on the Effective Date and shall continue until terminated by either party with Ninety (90) days written notice. Termination shall not relieve either party from fulfilling its obligations under this Agreement for claims submitted prior to the termination date.

**6. Indemnification:**
Both parties agree to indemnify and hold each other harmless from any claims, liabilities, losses, or damages arising from the actions or omissions of the other party.

## TERMS AND CONDITIONS

**Services to be Provided –** During the term of this Agreement, SOS will submit MSP's medical insurance claims for payment to insurance companies and government payers using an approved Third-Party Medical Billing Clearing House partner. SOS will prepare bills for MSP's patients for any balances that are responsible for after receiving medical services by MSP. SOS will follow up on MSP's insurance claims and aggressively pursue late or denied claims.

MSP will provide SOS with all necessary practice information, such as provider numbers, insurance numbers, codes and charges for the services provided by MSP, etc. MSP shall provide SOS with copies of all EOBs and payments received by MSP from our sources, such as co- pays and self-pays within a reasonable time of MSP's receipt, if applicable. MSP will provide any other information helpful for SOS to process, submit, and follow up on MSP's claims and accounts receivable.

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

SOS, and SOS's authorized Third-Party Clearing House representatives, are hereby authorized by MSP to contact the patients, insurance companies, and all other parties deemed necessary, and to obtain any information needed to perform medical billing services.

For the avoidance of any doubt, these terms are the only terms and conditions that apply to the provision of the Services. Any other terms and conditions that you purport to incorporate into the Agreement are expressly excluded.

While SOS endeavors to provide efficient and reliable service, the nature of oral communications is such that SOS shall not be liable to the caller or MSP for any errors of omission or commission.

**Liability Disclaimer**

The company cannot and does not assume responsibility for any damages, consequential or otherwise, resulting from any failure to submit or receive medical billing claims where such a failure is a result of the company's negligence, misconduct, error, or omission, including any medical coding. The company's liability shall in no event exceed an amount equal to the charges payable by the MSP for the month on which such act or omission occurred.

**HIPAA Compliance –** Each patient's information will remain confidential through the Health Insurance Portability and Accountability Act (HIPAA) and all Privacy Regulations. No information shall be disclosed to anyone except where necessary for SOS to perform its normal duties of medical billing services.

**Complete Agreement –** This agreement supersedes any and all agreements, both oral and written, between the parties with respect to rendering of these services in any manner whatsoever. This Agreement is the complete understanding of the parties. Each party acknowledges that no representations, inducements, promises, or agreements, written or oral, have been made by either party, or by anyone acting on behalf of either party, that are not embodies in this Agreement.

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

## Services and Fees

### A. SOS Standard Billing Services and Fee Schedule

| SOS Services Provided | Fee |
|---|---|
| • Posting of all charges within 48-72 hours after receipt of claim<br>• Follow up on all claim denials<br>• Post all payments within 48-72 hours after receipt (unless payment directed to Medical Service Provider's account)<br>• Daily bank reconciliation (N/A)<br>• Summary reports supplied monthly<br>• SOS's business hours are 8:00 – 5:00 MTN, Mon-Fri<br>• Verify patient eligibility with insurance provider<br>• Interface with SOS AbundaBox's fulfillment centers to verify shipment | Included |
| **SOS Fee percentage on collected revenue** | Waived |
| **SOS Implementation Fee** | $0 |
| **SOS Customization Fee** | N/A |

| Medical Service Provider Responsibilities |
|---|
| • Collecting accurate patient demographics<br>• Scan any relevant mail into the system<br>• Provide EMR connectivity to SOS if Medical Service Provider requests an integration<br>• Work with SOS to resolve ineligible patient issues |

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed and delivered under seal as of the Effective Date. This Billing Services Agreement ("Agreement") is entered into by and between:

**SOS AbundaBox™, LLC**

Signed By: _____

Name:  Emily Jones
Title: CEO
Date: 9/9/2023

**Quickmed, LLC**

Signed By: _____

Name:  Lena Esmail
Title:  CEO
Date:  9/9/2023

DocuSign Envelope ID: 55A1B223-5075-412B-BBFC-8811E1FA78B0

**Setup Form**

For enrollment(s) we need the following:

- NPI Number(s)
- Tax ID
- States of Operation
- List of payers and their internal payer codes for each provider
- IP Address for SFTP transfer of batch file (if authorized by the Medical Service Provider)
- Separate IP address for API (if authorized by the Medical Service Provider)

**Authorization 1:**   We only have one tax ID/ NPI

NPI:   1528528726

Tax ID:   83-3135690

States Authorized for Operation:   Ohio

Payers & Payer Codes for Each Provider: will provide

IP Address (optional):   NA


**Authorization 2:**  na

NPI:  na

Tax ID:  na

States Authorized for Operation:  na

Payers & Payer Codes for Each Provider:  na

IP Address (optional):  na


**Authorization 3:**  na

NPI:  na

Tax ID:  na

States Authorized for Operation:  na

Payers & Payer Codes for Each Provider:  na

IP Address (optional):  na